**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TERRY and JAMIE MINNIS, Individually** | ) | |
| **and o/b/o JOHN DOE, a minor,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:10-cv-0075** |
| | ) | |
| **SUMNER COUNTY BOARD OF EDUCATION** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **and DONNA WEIDENBENNER** | ) | **Magistrate Judge Juliet E. Griffin** |
| **Individually and in her official capacity** | ) | |
| **as Special Needs Teacher of** | ) | |
| **Station Camp Elementary School,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Before the Court is Defendant Sumner County Board of Education's Motion for Summary Judgment (Doc. No. 52). Defendant Donna Weidenbenner has filed her own separate motion for summary judgment (Doc. No. 56), incorporating by reference the Board's Memorandum in Support of its motion as well as the Board's Concise Statement of Material Facts. Plaintiffs have filed their response in opposition to the motions, which have now been fully briefed and are ripe for resolution.

Defendants previously filed motions to dismiss and to strike certain portions of the Complaint. On September 20, 2010, the Court denied the motion to strike, denied the Rule 12(b)(1) motions to dismiss for failure to exhaust under the IDEA, and granted in part the 12(b)(6) motions by dismissing without prejudice the claims asserted under § 504 of the Rehabilitation Act (Count IV) against the Board, and by dismissing with prejudice (1) that portion of Count I alleging deprivation of John Doe's right to familial association; (2) Count III, alleging deprivation of Plaintiffs' rights to familial association; (3) the claims against the Board based directly on Weidenbenner's behavior based on a theory that she was an official policymaker for the Board; (4) claims against the Board based on the Board's purported special relationship with John Doe; and (5) the claims in Count IV (under the Rehabilitation Act and Section 504) (Count IV) against Weidenbenner in her official and individual capacities. (Sept. 20, 2010 Order, Doc. No. 36.) All other portions of the 12(b)(6) motions were denied.

As a result of the Court's ruling, there remained pending causes of action against both the Board

and Weidenbenner under 42 U.S.C. § 1983. The claim against Weidenbenner, Count I, is premised upon allegations that Weidenbenner violated § 1983 by depriving John Doe, under color of law, of rights secured by the First and Fourteenth Amendments to the United States Constitution, "includ[ing], but . . . not limited to" freedom from the use of excessive force, the deprivation of liberty and property without due process of law, freedom from summary punishment, and freedom from the use of arbitrary government action which "shocks the conscience of a civilized society." (Compl. ¶ 18.)

The § 1983 claim asserted against the Board in Count II of the Complaint is based upon an alleged deliberate indifference on the part of the School Board manifested by failure to train or discipline teachers in the detection and prevention of abuse against students by teachers, or to investigate properly reports of abuse by teachers, all of which resulted in the alleged deprivation of John Doe's rights to "be free from unreasonable seizures, use of force and arbitrary governmental activity which shocks the conscience in violation of the rights secured to him by the Fourth and Fourteenth Amendment[s]." (Compl. ¶ 22.) Plaintiffs also seek to hold the Board liable under 42 U.S.C. § 1983 for Weidenbenner's actions "under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, respondeat superior, joint venture, contract and as a result of their [sic] non-delegable duty to provide educational services to disabled persons in compliance with the constitution and laws of the United States and the State of Tennessee." (Compl. ¶ 26.)

In other words, all of Plaintiffs' claims are contingent upon a threshold finding that Weidenbenner actually violated John Doe's constitutional rights. As set forth herein, the Court finds that there is no plausible evidence in the record to suggest that Weidenbenner abused John Doe in such a manner as to cause injury of constitutional dimension.[1] For that reason alone, Defendants are entitled to summary judgment in their favor and dismissal of all claims asserted against them in this action.

I.      STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of

---

[1] Plaintiffs have not asserted any supplemental state-law causes of action in their Complaint.

the plaintiff's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party, on the other hand, must present sufficient evidence from which a jury could reasonably find for him. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court then must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In making this determination, the court must draw all reasonable inferences in favor of the non-moving party. *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir.1997).

## II.     STATEMENT OF FACTS

The Board has within its purview 46 schools, approximately 28,000 students, and approximately 4,200 employees including 46 principals and roughly 2,200 teachers. Defendant Weidenbenner was employed by the Board as a special-education teacher from 1991 until April 2009. She was assigned to teach special-education preschool classes at Beech Elementary School, a Sumner County public school, during the 2005-2006 and 2006–2007 academic years. Weidenbenner was licensed to teach by the State of Tennessee, and held the appropriate endorsements for the special-education preschool classroom in which she taught. She had been evaluated over the years with satisfactory results.

Brenda Green was assigned to Beech Elementary School as the Assistant Principal from July 1998 through December 1998, and as Principal from January 1999 through June 2008.

The Board has introduced abundant evidence regarding Weidenbenner's history, the supervision and oversight of her activities, and the fact that no one formally reported her for abusing any of the special-needs children in her care until the spring of 2009, when she was teaching at Station Camp Elementary School, also within the Sumner County school district. Sometime in the early spring of 2009, special education teachers Daphne Fritz and Teresa Schweinsberg had a discussion in which Fritz expressed that she was upset about certain things she had observed in Weidenbenner's classroom and did not know what to do about it. Schweinsberg, in her deposition, did not recall that Fritz specified any particular behavior she was concerned about but Fritz recalls they discussed whether use of a weighted blanket and physically redirecting a head were appropriate. Schweinsberg suggested that Fritz talk to the principal or the special-education coordinator about her concerns.

On or about March 30, 2009, Schweinsberg gave Dr. Linda Cash, Principal of Station Camp

Elementary School, a letter detailing her own concerns about Weidenbenner, including that she was improperly restraining children and force-feeding them. Schweinsberg did not submit a report to the Department of Children's Services ("DCS") about Weidenbenner because she did not consider the conduct she had observed to rise to the level of child abuse. Dr. Cash, however, perceived the incidents related by Schweinsberg to be potentially abusive, so she made a report to DCS and to the school system's Human Resources Department. Authorities began an investigation into the complaint. After Schweinsberg submitted her letter, Daphne Fritz also submitted a letter to Cash detailing her concerns about Weidenbenner's treatment of the children in her care.

Weidenbenner was removed from the classroom on April 1, 2009. She later resigned. She was indicted in August 2009 on three counts of child abuse.

Plaintiff's minor child, John Doe, was diagnosed in October 2005 as developmentally delayed. He was three and a half years old at that time. In December 2005, he was diagnosed as having an autism-spectrum disorder. He began attending Beech Elementary School in late February or early March 2006, shortly before his fourth birthday, and was placed in Weidenbenner's special-needs preschool class for the remainder of that academic year, and for the entire 2006–2007 academic year.

In approximately April 2006, Jamie Minnis noticed bruises on her son's upper arm that looked like an adult hand-print, "four fingers and underneath was a thumb." (J. Minnis Dep. 75:6–7.) She asked her son how his arm got hurt and he said, "Miss Donna [Weidenbenner] hit me." (J. Minnis Dep. 75:18–19.) She asked her son later, and he again repeated that "Miss Donna" had hit him and "it hurt." (J. Minnis Dep. 76:7.) She videotaped his response.[2]

She asked Weidenbenner about it the next day. Weidenbenner explained that John Doe had been playing with other children and began running, "getting wild," and she had "grabbed his arm to stop him from running and that that must have been how it happened." (J. Minnis Dep. 76:13–15.) Minnis accepted Weidenbenner's account as a reasonable explanation for the bruises. She never mentioned the episode to the school principal or anyone else.

Minnis also recalled that after John Doe's first month at school, he remained happy to go to school, but was very emotional every day when she picked him up, crying and saying "Mommy, I'm so

---

[2] This videotape is not in the Court's record.

glad to see you" and "Mommy, I missed you," with "lots of tears and hugging." (J. Minnis Dep. 77:21–23.) He exhibited this behavior nearly every day until the end of the year, but nothing else occurred during that school year that gave Minnis concern. She spoke with Weidenbenner every day after school when she was picking up her child, and the child seemed to be doing fine and making progress.

During the 2006–2007 school year, John Doe became increasingly anxious about attending school. Minnis spoke with Weidenbenner about this anxiety on a daily basis.

In approximately February or March of 2007, Minnis walked her son into the classroom and observed Weidenbenner grab a child by his upper arm and shove him toward his "cubby," where the children stored their jackets and backpacks. Weidenbenner then saw Minnis observing her and told her the child had been out sick for a few days and had "forgotten where things went." (J. Minnis Dep. 126:17–19.) Minnis could not say that this action was abusive or caused injury to the child, but it caused her concern. After observing that incident, she began walking her son into his classroom a couple of times a week, just to give her the opportunity to see what was going on in the class. Minnis did not talk to Weidenbenner about the incident or mention it to anyone else. She never witnessed any other incident that caused her concern.

On April 10, 2007, John Doe began crying as usual when she picked him up but otherwise was quieter than usual and did not want to talk to anyone. She asked him what he did in school that day and he responded that he "had been bad today." (J. Minnis Dep. 139:12–13.) She asked what happened and he told her "Miss Donna grabbed his head and shook it and it really hurt." (J. Minnis Dep. 139:20–22.) She asked him why, and he said "because he wouldn't do his work." (J. Minnis Dep. 141:14–15.) She reported that John Doe gave the same explanation to her friend that afternoon and to her husband when he came home from work shortly thereafter.

Jamie Minnis contacted the school the same afternoon to set up a meeting with the principal. She actually spoke with Principal Green on the telephone and relayed to her what John Doe had told her, and that she believed it "was unacceptable for [him] to be hurt." (J. Minnis Dep. 149:11–12.) Green offered to meet the following day, on April 11, 2007.

The next morning, both Mr. and Mrs. Minnis met with both Green and Weidenbenner. Mrs. Minnis recalled that she and her husband repeated the story that their son had told them. Weidenbenner

explained her version of the incident, according to which she did not "grab his head"; rather she "held his head to get his attention." (J. Minnis Dep. 155:17–18.) Green then proceeded to explain that Weidenbenner "required a lot of her students, . . . that her approach to the curriculum was different than some other teachers['] but that it was effective." (J. Minnis Dep. 156:16–19.) From there, the meeting turned toward "describing [John Doe's] negative behaviors . . . and what to do about those." (*Id.* 156:19–22.) According to Minnis, she and her husband tried unsuccessfully to redirect the topic of the meeting to their concerns about the incident the prior day. Mr. Minnis also brought up the fact that John Doe had come home with bruises on his arm the year before, and Mrs. Minnis reported that their son had anxiety about going to school. Weidenbenner stated that she had not felt that he showed anxiety while at school.

Green took notes during the meeting, which were ultimately signed by all four participants. The notes reflect that the parents requested that a board-certified behavioral specialist observe John Doe in the classroom and offer recommendations to the teacher. The notes also reflect that the parties agreed that Weidenbenner would "try[] not to touch [the child] in order to avoid his anxiety." (J. Minnis Dep. 165:6–7.) The Minnises left the meeting feeling frustrated, because they did not feel that their claims regarding what had happened to their son were adequately discussed or resolved.[3] However, they did not contact the Sumner County Board of Education or any other entity or person to discuss their concerns after this meeting, and John Doe finished the school year in Weidenbenner's class without incident, though the child continued to exhibit anxiety about going to school and to cry when his mother came to pick him up. According to his mother, he also began experiencing separation anxiety any time she tried to leave him with a neighbor or babysitter.

Mrs. Minnis also reported that a year and a half later, in approximately October 2009, she was watching the news on television when her son, then seven years old, walked into the room. He arrived just as Weidenbenner's photograph was being displayed on the television, and Minnis muted the sound so he could not hear what was being said. According to Minnis, as a result of seeing Weidenbenner's

---

[3] According to Green, after speaking with Jamie Minnis on the phone on April 10, she spoke with both Weidenbenner and Weidenbenner's assistants about the child's allegation, but the assistants had not witnessed the event. Green accepted Weidenbenner's explanation of what occurred, because, as she explained, she "had not reason to doubt her account of the story . . . . She had always been a good teacher, and she had never been in a situation like that before." (Green Dep. 46:20–47:1.) Green also believed that the parents' concern for their child was understandable but felt that they might have exaggerated their child's complaint.

image on television John Doe was "visibly shaking" and he was "breathing raggedly" as he stared at the screen.  (J. Minnis Dep. 177:6.)  She asked him what was wrong and he asked "Why is Miss Donna on TV."  (J. Minnis Dep. 177:12.)  Minnis responded that she did not know, and John Doe "said something to the effect of is she on there because of the bad things she did."  (J. Minnis Dep. 177:20–21.)  Minnis asked him to explain and he said something about "when she hurt" him.  (J. Minnis Dep. 178:7.)  John Doe refused to answer further questions and ran into the other room.  Minnis also testified that since then, in April or May 2010 when she had started getting him mentally prepared to go back to public school, he has asked, "Are [the new teachers] going to hurt me?"  (J. Minnis Dep. 182:25.)  He also has asked if Weidenbenner "is in jail."  (J. Minnis Dep. 183:14.)  Minnis did not know what prompted him to ask that, except that she believed that she had told him, after he saw her on television in the fall of 2009, that Weidenbenner "might be in trouble for being mean."  (J. Minnis Dep. 184:7–8.)  John Doe later asked if Weidenbenner could "dig her way out of jail."  (J. Minnis Dep. 184:20.)

John Doe began seeing Dr. Jay Woodman, at the Minnises' attorney's referral, for purposes of a psychological assessment between January and April 2010.  He saw Dr. Woodman eight to ten times.  He started seeing a therapist and a coordinator overseeing his care beginning in May 2010.

### III.    ANALYSIS AND DISCUSSION

Defendants have now filed their motions for summary judgment, asserting, among other arguments, that Weidenbenner's treatment of John Doe did not amount to a violation of his constitutional rights.

To establish municipal liability under § 1983, a plaintiff must show (1) the existence of a municipal policy or custom, and (2) that there is a causal link between the policy or custom and an alleged constitutional deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  The thrust of Plaintiffs' claims against the School Board is that the Board is liable under § 1983 by virtue of a municipal policy, practice, or custom and a failure to train, supervise, enforce policies or conduct adequate investigations of prior complaints, all of which led to a violation of their son's constitutional rights.  Thus, the Board's liability is premised upon a threshold determination that defendant Weidenbenner's actions actually violated John Doe's constitutional rights.  *City of Canton*, 489 U.S. at 385; *cf. Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (noting that the plaintiff, to succeed on her § 1983 claims against

the municipality, must prove the deprivation of a constitutional right and that the school district was responsible for that violation). Obviously, whether Plaintiffs can recover damages from Weidenbenner also depends on whether they can establish that Weidenbenner violated their son's substantive due-process rights.

Clearly, not every tort rises to the level of a constitutional violation, *Paul v. Davis*, 424 U.S. 693, 699–701 (1976), and not every deprivation of a liberty or property right requires a pre-deprivation hearing or a federal remedy. *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273 (6th Cir. 1988). The Supreme Court has recognized that "corporal punishment in public schools implicates a constitutionally protected liberty interest," specifically, an interest in procedural due process, but the Court also held that the states' "traditional common-law remedies are fully adequate to afford due process." *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). The Supreme Court has not reached the question of whether punishment inflicted in the educational context may implicate *substantive* due process rights, but the Sixth Circuit, along with most of the other Circuit Courts of Appeals, has found that it can. *Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir.1987).

The seminal case addressing excessive force in public schools is *Hall v. Tawney*, 621 F.2d 607 (4th Cir. 1980). *See Saylor v. Bd. of Educ. of Harlan County*, 118 F.3d 507, 514 (6th Cir. 1997); *Webb*, 828 F.2d at 1158; *see also Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 173 (3d Cir. 2001) ("*Hall* now provides the most commonly cited test for claims of excessive force in public schools."). In *Hall*, the minor plaintiff was repeatedly paddled and was subsequently taken to the emergency room where she was admitted and kept for ten days for treatment of traumatic injuries to her left hip, thigh and buttock. She received treatment from specialists for possible permanent injuries to her lower back and spine. *Hall*, 621 F.2d at 614. In finding that the plaintiffs had stated a substantive due process claim in that case, the United States Court of Appeals for the Fourth Circuit proclaimed:

> In the context of disciplinary corporal punishment in the public schools, we emphasize once more that the substantive due process claim is quite different than a claim of assault and battery under state tort law. In resolving a state tort claim, decision may well turn on whether "ten licks rather than five" were excessive . . . so that line-drawing this refined may be required. But substantive due process is concerned with violations of personal rights of privacy and bodily security of so different an order of magnitude that inquiry in a particular case simply need not start at the level of concern these distinctions imply. As in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be *whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so*

*inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.* Not every violation of state tort and criminal assault laws will be a violation of this constitutional right, but some of course may.

*Hall*, 621 F.2d at 613 (emphasis added; citations omitted).

The Sixth Circuit expressly adopted this rationale in *Webb*, 828 F.2d at 1158, in which a high school girl on a school trip locked herself in the bathroom after the principal informed her that he was going to send her home upon his discovery of a boy and alcohol in her room. *Id.* at 1153–54. The principal became angry when he realized the girl had locked herself in the bathroom. He attempted to "jimmy" the lock, but when that failed he slammed into the door repeatedly with his shoulder. The door gave way knocking the girl against the wall and then onto the floor. The principal grabbed her from the floor, threw her against the wall and slapped her. *Id.* at 1154.

The Sixth Circuit, quoting from *Hall*, determined that there was at least a question of fact as to whether the plaintiff could recover for violation of her substantive due process rights. It reversed and vacated the district court's order granting the defendant's motion for summary judgment, stating:

> Because the alleged blows were not struck in the school context, where the need for immediate disciplinary control . . . is at its greatest, because [the principal] was *in loco parentis* to [the plaintiff], and because it is possible that the blows were not disciplinary in nature, a trier of fact could find that under the circumstances, [the principal's] need to strike [the plaintiff] was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of [the principal's] official power, literally shocking to the conscience.

828 F.2d at 1159. The Court also noted that the record did not reveal any reason for the blows or that "the blows arose other than in anger or from malice." *Id.* at 1158.

In the present case, the only evidence of physical injury offered by the Plaintiffs is that on one occasion, Weidenbenner grabbed John Doe's head and shook it in the process of redirecting his attention, and on one other occasion, a year previously, she grabbed him by the arm hard enough to cause bruises to stop him from running wildly in the classroom. These injuries, which were clearly pedagogically oriented or disciplinary in nature, do not rise to the level of conscience-shocking injury and are not sufficient to give rise to a claim of constitutional violations. *Compare Gonzales v. Passino*, 222 F. Supp. 2d 1277, 1281 (D.N.M. 2002) (granting defendants' motion for summary judgment on the plaintiff student's Fourteenth Amendment substantive-due-process claim where a teacher, in response to the student plaintiff's use of an epithet, struck the plaintiff with a plastic bat, causing minor bruising and

swelling, and later pushed him hard enough to make him stumble; although there was no pedagogical justification for the use of force, the court found that the blow did not amount to a conscience-shocking "brutal and inhumane abuse of official power"). *See also Brown v. Ramsey*, 121 F. Supp. 2d 911, 920 (D. Va. 2000) (collecting cases where summary judgment was appropriate notwithstanding actual, minor physical injury). The cases upon which Plaintiffs rely are clearly distinguishable.

Plaintiffs' complaint and proof may also be construed as alleging that John Doe, though not seriously physically injured, was psychologically harmed as a result of Weidenbenner's treatment of him, and as a result of his being forced to witness Weidenbenner's allegedly inappropriate treatment of other students, and that this psychological injury in and of itself is significant enough to give rise to a claim of constitutional dimension. It appears that courts have not yet recognized—but have also not ruled out— the proposition that "psychological harm unaccompanied by serious physical injuries can be sufficient to satisfy the injury requirement" for stating a claim for a substantive-due-process violation in the school context. *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588 (11th Cir. 2010) (granting summary judgment to school board despite student's claim of post-traumatic stress disorder resulting from teacher's treatment of him); *Abeyta by & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1257 (10th Cir. 1996) (where a twelve-year-old student alleged her teacher had repeatedly called her a prostitute in front of the class over a period of several weeks, allegedly causing her psychological harm, the court granted summary judgment to the school district on the basis that the teacher's conduct was not so severe as to be actionable under § 1983 as a substantive due process violation); *Brown v. Ramsey*, 121 F. Supp. 2d at 923 (holding that "no reasonable jury could conclude that [the student's] alleged injuries in this case are 'severe,'" where the child, a first-grader with Asperger's Syndrome, allegedly suffered from post-traumatic stress disorder after having been repeatedly placed in a "basket hold" restraint over the course of the school year). However, at the very least, the degree of psychological harm would have to be "severe" to satisfy the injury requirement for a constitutional violation. *Abeyta*, 77 F.3d at 1257.

In *T.W.*, the Eleventh Circuit had occasion to consider whether a student who had been diagnosed with pervasive developmental disorder, and who allegedly suffered psychological harm as a result of his teacher's use of force, stated a substantive-due-process claim. The facts indicated that the

teacher used profanity in her classroom on a daily basis, frequently directed at her students, told the plaintiff student that he "stinks" and called him "lazy, an asshole, a pig, and a jerk." *T.W.*, 610 F.3d at 594. She frequently teased and agitated him until he became angry. The teacher also had a reputation as a disciplinarian who used physical force against several of her students, including the plaintiff, and failed on occasion to protect her students from harming themselves or others.

The plaintiff's claims arose from the teacher's use of force against him. She allegedly used force against the plaintiff on five separate occasions. Four of these occasions involved using inappropriate restraints, but all in a disciplinary or pedagogically justified context. On the fifth occasion, the teacher attempted to trip the plaintiff, causing him to stumble. Except for minor bruises on two occasions, the plaintiff was not physically injured by the teacher's use of force, but his behavioral problems were exacerbated, he developed trust issues and panic attacks, began "urinating all over the place," cried on the way to and from school, and refused to close doors. He later dropped out of school. A psychologist retained by the plaintiff opined that all these behaviors were traceable to the teacher's actions and caused symptoms of Post Traumatic Stress Disorder.

The Eleventh Circuit nonetheless concluded that the evidence was insufficient to establish that the teacher violated the student's substantive due process rights under the Fourteenth Amendment. In reaching that conclusion, the court first noted that the evidence "overwhelmingly establishe[d]" that the teacher's use of force in the first four instances was related to the student's behavior and was for the purpose of discipline. The fifth instance, where the teacher tried to trip the student, clearly had no pedagogical objective but "under any analysis, it is inconceivable that tripping a student and causing the student to stumble, without more, violates the Constitution." 610 F.3d at 599.

With respect to the other four instances, the court noted that a claim of excessive corporal punishment had "an objective and a subjective component, both of which must be met before a school official may be subject to liability." *Id.* (quoting *Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1075 n.3 (11th Cir. 2000)). That is:

> The evidence must support a reasonable inference that the punishment is "obviously excessive" as an objective matter and that [the teacher] subjectively intend[ed] to use that obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could result. To determine whether a use of force is obviously excessive, we consider the totality of the circumstances [including the student's disability]. Three factors are particularly relevant: (1) the need for the application of

corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted.

*Id.* at 599 (internal quotation marks and citations omitted).

In considering each of the other four instances of force individually under that standard, the court found that each was "capable of being construed as an attempt to serve pedagogical objectives." *Id.* at 600 (quoting *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 174 (3d Cir. 2001)). The evidence, even viewed objectively, also established that on each of the four occasions when restraints were used, "there was at least some reason . . . for [the teacher's] use of force." *Id.* (citation omitted). Thus, even if the force was exerted too soon or when alternative methods might have sufficed, the court could not say that the use of force was "wholly unjustified by a government interest." *Id.* (citation omitted). The court also concluded that the teacher had restrained the student inappropriately and even dangerously on each occasion, but that none of the restraints had lasted longer than several minutes, at most, and generally only until the student agreed to follow the teacher's commands or calmed down. Thus, the amount of force was not "totally unrelated" to the need for force. *Id.* at 601. (citation omitted).

Finally, the court considered the extent of the injuries, which, while only one factor in the analysis, was nonetheless "an important factor." *Id.* Thus, for example, chocking a student until he lost his breath and sustained blue and red bruises and a scratch on his neck was not "obviously excessive because 'the extent of the student's bodily injury was not serious.'" *Id.* (quoting *Peterson v. Baker*, 504 F.3d 1331, 1334–35, 1337 (11th Cir. 2007)). But "hitting a student in the eye with a metal weight lock, permanently destroying the eye, was obviously excessive," *id.* (citing *Neal*, 229 F.3d at 1076), as was "striking a student with a metal cane on the head, ribs, and back with sufficient force to cause a large knot and continuing migraine headaches." *Id.* (citing *Kirkland ex rel. Jones v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903, 904 (11th Cir. 2003)).

The student in the case before the Eleventh Circuit suffered minor bruises and transient pain. He also, however, asserted that the teacher's conduct aggravated his developmental disability, exacerbated his behavioral problems, and caused symptoms of Post Traumatic Stress Disorder. In considering whether these injuries might give rise to a substantive-due-process claim, the court stated:

We are mindful that students like T.W., who suffer from severe developmental disabilities, are particularly vulnerable to psychological harm, and that psychological injuries can be as traumatic, if not more traumatic, than physical injuries. It is clear that [p]laintiffs have

not fared well where psychological damage forms either the sole basis of or is an element of the plaintiff's substantive due process claim, but we can imagine a case where an exercise of corporal punishment—even one that causes only psychological injury—might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in *Rochin [v. California*, 342 U.S. 165 (1952)]*.

We need not decide whether corporal punishment that causes only psychological harm is categorically below the constitutional threshold. After considering the totality of the circumstances, including T.W.'s psychological injuries, we conclude that [the teacher's] conduct was not so arbitrary and egregious as to support a complaint of a violation of substantive due process. We do not condone the use of force against a vulnerable student on several occasions over a period of months, but no reasonable jury could conclude that [the teacher's] use of force was obviously excessive in the constitutional sense. . . .

Our decision comports with the Supreme Court's mandate to remain vigilant in policing the boundaries separating tort law from constitutional law. Although the circumstances that gave rise to T.W.'s claim are truly unfortunate, the Due Process Clause imposes liability only in extraordinary circumstances. We disapprove of [the teacher's] alleged actions in no uncertain terms, and we are sympathetic to the harm that T.W. and his classmates suffered as a result of [her] misconduct. Nevertheless, we cannot say that the exercises of corporal punishment and force in this appeal are "'so brutal, demeaning and harmful as literally to shock the conscience of the court.'" *Neal*, 229 F.3d at 1075 (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)).

*Id.* at 601–02 (most internal quotation marks and citations omitted)

In the case at hand, the psychological harm allegedly suffered by John Doe is of a similar magnitude to that allegedly suffered by T.W.[4] The two proven instances in which Weidenbenner laid her hands on John Doe had a clear pedagogical objective and cannot be said to have been "wholly unjustified by a government interest." *Id.* at 599. Nor could a reasonable jury conclude that the amount of force was "totally unrelated" to the need for force. *Id.* at 601. Finally, even if the Court assumes that the child did nothing whatsoever to provoke the actions, the teacher's acts of grabbing the child's face and shaking his head on one occasion, and grabbing his arm on another occasion hard enough to cause bruising, simply do not rise to the level of a "conscience-shocking," brutal and inhumane abuse of authority. In short, however regrettable Weidenbenner's effect on the child may be, the evidence is insufficient to establish that Weidenbenner violated John Doe's substantive-due-process rights. Because a violation of those rights is a required element of the claims asserted against both the School Board and Weidenbenner

---

[4] The Court accepts as true, for purposes of summary judgment, the parents' testimony regarding the changes in their son's behavior and the psychological symptoms he is exhibiting. Although Plaintiffs have submitted the "Rule 26 Statement as to David L. Corwin" and a "Psychological Report" prepared by Jay D. Woodman, Ph.D., these unsworn reports are hearsay which may not be considered on a motion for summary judgment. *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619–20 (6th Cir. 2003). Even if they were in admissible form, the opinions of these doctors amount to nothing more than speculation and supposition.

individually under § 1983, those claims must fail and Defendants are entitled to summary judgment in their favor.

## IV.    CONCLUSION

Defendants' motions for summary judgment will be granted and this matter dismissed on the grounds that Plaintiffs have not demonstrated that John Doe suffered severe injury resulting from a conscience-shocking abuse of authority.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge